# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

HESS DELL JOINER,

                Plaintiff,

      -vs-

MVP SERVICE CORPORATION,

                Defendant.

DECISION and ORDER

11-CV-6497-JWF-CJS

## APPEARANCES

For Plaintiff:                Hess Dell Joiner *pro se*
                                    3351 Heather Brook Lane
                                    Macedon, NY 14502

For Defendants:            Michael Billok, Esq.
                                    Bond, Schoeneck & King, PLLC
                                    111 Washington Avenue
                                    Albany, NY 12210-2280

## INTRODUCTION

**Siragusa, J.** This employment discrimination case is before the Court Defendant's motion for summary judgment, filed on December 19, 2013, ECF No. 48. For the reasons stated below, Defendant's application is granted.

## FACTUAL BACKGROUND

Defendants complied with L.R. Civ. P. 56 and filed a statement of material facts, Dec. 19, 2013, ECF No. 49, as well as the required notice to *pro se* litigants, Dec. 19, 2013, ECF No. 55.[1] Plaintiff responded with a "Rule 56 Counterstatements of Material Facts that Are In Dispute," Jan. 23, 2014, ECF No. 59 ("Pl.'s Counter-Statement").

---

[1] *See Irby v. New York City Transit Authority*, 262 F.3d 412 (2d Cir. 2001).

Plaintiff's Counter-Statement is signed under penalty of perjury. *Id.* at 46. From those statements and the complaint, the Court gleans the following material facts important to disposition of this motion.

Plaintiff alleges that Defendant violated her rights under the Age Discrimination in Employment Act of 1967 ("ADEA") and Title VII of the Civil Rights Act of 1964 (race based claims). Compl. at 1. Plaintiff's specific claims from the Complaint are: failure to provide her with reasonable accommodations to the application process; failure to provide her with reasonable accommodations so she could perform the essential functions of her job; harassment on the basis of unequal terms and conditions of her employment; retaliation because she complained about discrimination or harassment directed toward her; and hostile work environment. Compl. at 3. She claims discrimination based on her race, age (date of birth June 1955) and national origin. Compl. ¶ 14.

Plaintiff commenced employment with Defendant on February 25, 2008. She alleges that acts of discrimination occurred on several dates in 2010 and 2011. *See* Compl. at 1. She was terminated on February 3, 2012. Def. Appx. at 447–50. Defendant's lengthy statement of facts sets out detailed, almost day-to-day assessments of Plaintiff's performance, while Plaintiff's Counter-Statement provides the minutia of contradictory facts. Many of Plaintiff's counter-statements are not supported by citation to evidentiary proof in admissible form, and her responses to some of Defendant's assertions of fact are pages long, for example, ¶ 6 (*Compare* Def.'s Statement: "MVP Service Corp. maintains both an Equal Opportunity Policy and an Unlawful Harassment Policy that prohibit harassment and discrimination on race, gender, age, and any basis protected by law, as well as retaliation for making any complaint of harassment or discrimi-

nation. Rivera-Platt Decl. at ¶ 5; Appendix ("App.") at 309-11." *to Pl.'s Counter-Statement* which begins at page 6 and includes charges that Plaintiff was treated unequally that continue until page 17). Where Plaintiff's Counter-Statement violates L.R. Civ. P. 56, the Court has disregarded it.[2]

Defendant provides health care insurance and administrative services, including timely and accurate processing of claims. Plaintiff disputes that white supervisors were required to timely process claims.  Pl.'s Counter-Statement ¶ 3. However, her citation to Def. Appx. at 56 reveals only hand-written notes with no evidentiary foundation listing the names, "Caroline" on one line, "Faith Boswell" on the next and "Linda Wallace" on a third, and under those lines, "write up for being 32 days late paying claim." Def. Appx. at 56. The page contains no evidence of who wrote the notes, or what they mean. Defendant states that Plaintiff was hired by Debbie Groth, MVP's Claims Manager of Government Programs, as a claims processor in the claims processing department on February 25, 2008. Subsequently, on January 10, 2010, as a result of a department restructuring, Plaintiff reported directly to Groth, whereas previously, she reported to a different supervisor. Def.'s Statement ¶¶ 8–10. Though Plaintiff disputes these statements, she provides no citation to evidentiary proof in support of her disagreements.

---

[2] (2) **Opposing Statement.** The papers opposing a motion for summary judgment shall include a response to each numbered paragraph in the moving party's statement, in correspondingly numbered paragraphs and, if necessary, additional paragraphs containing a short and concise statement of additional material facts as to which it is contended there exists a genuine issue to be tried. Each numbered paragraph in the moving party's statement of material facts will be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement.

(3) **Citations.** Each statement by the movant or opponent pursuant to this Local Rule must be followed by citation to evidence that would be admissible, as required by Federal Rule of Civil Procedure 56(e). Citations shall identify with specificity the relevant page and paragraph or line number of the authority cited.

On March 22, 2010, Debbie Groth promoted Plaintiff to a team leader position in the government programs department. Def. Appx. at 368. At a meeting with Debbie Groth and Jason Kurz in April 2010, Kurz called Plaintiff a liar and, according to Plaintiff, who was Kurz's supervisor, Kurz "only wanted to do what he wanted to do and not what was actually assigned to him." Joiner Dep. 38:9–10 (Def. Appx. at 154). At her deposition, Plaintiff agreed that it was unacceptable for an employee to do what he wanted to do and not what his supervisor wanted him to do. *Id.* 40:5–9 (Def. Appx. at 156). Following the meeting, Plaintiff asked Groth for her old position back, and Groth responded, "It's going to be hard, but you're doing a good job. I want you to stay there." *Id.* 40:15–17 (Def. Appx. at 156).

On May 26, 2010, Groth called another meeting with Plaintiff concerning one of Plaintiff's subordinates, Sandy Langmaid. Joiner Dep. 44:18–22 (Def. Appx. 160). According to Plaintiff, Langmaid had an issue with the way Plaintiff was structuring and prioritizing her workload. During the meeting, Groth encouraged Plaintiff "to increase the communication between" herself and Langmaid. *Id.* 45:20–21 (Def. Appx. 161).

On June 24, 2010, Groth called a meeting with Plaintiff and Kellie Traver, Associate Director of Rochester Operations, to discuss concerns Traver's staff had brought to her attention. *Id.* 45:22–46:11 (Def. Appx. 161-62). With respect to this meeting, Plaintiff testified that she recalled a concern about the fact she had asked Kurz to return to work while he was having a conversation with two people on the floor, and a complaint by Sarina Miller-Richardson that Plaintiff treated her disrespectfully. *Id.* 46:8–23 (Def. Appx. 162).

Plaintiff testified that she did not recall an October 5, 2010, "due process" meeting with Groth to discuss an email that Plaintiff had sent to another employee, *id.* 47:22–48:14; however, she did recall having several meetings with Groth regarding complaints from employees about how Plaintiff treated them when asking them questions, *id.* 48:15–21 (Def. Appx. 164). At her deposition, Plaintiff indicated that she reviewed an email she sent on October 4, 2010, at 4:02 p.m. to Carolyn Stuckey, in which Plaintiff wrote, "You made an issue on this from Friday, when I were [sic] playing with you." Joiner Dep. 49:17–25 (Def. Appx. 165). Plaintiff stated she forwarded the whole email string to several employees, including her supervisor, Groth, "[b]ecause Debbie Groth wasn't telling the truth." *Id.* at 50:18–19 (Def. Appx. 166). Asked to explain, Plaintiff responded saying:

> A. When she said data entry asked for help, the very first paragraph. Ladies, data entry indicated they asked for help on Friday with this report and was told that they had to do it themselves. That was not the truth. That was an incomplete. She was not telling the truth.

Joiner Dep. 51:8–13 (Def. Appx. 167). Following several questions and answers that simply confused the issue more, opposing counsel asked the following follow-up questions and received Plaintiff's answers:

> Q. So let me get this straight. On October 4, 2010, at 4:08 p.m., you sent an e-mail to Carolyn Stuckey saying, "You told me you will let me know when Sue," underlined, "find out what she had coming to work on. I had to wait because you couldn't make that decision until then." Ms. Stuckey responds, "You still on this. If I needed help, I would have came and asked. Roz came in at 1 and it got finished. What is the problem now? Every day it's something. And I am not trying and don't want to deal with no office politics or he say she say. But if you think that it's on me, okay, so be it. It's not that serious. What's really going on?" You take this e-mail chain and you forward it to several people. And is it your testimony today, under oath, that the reason you did this was not because of Carolyn Stuckey, but because of Debbie Groth?

A. Because Debbie Groth's inconsistency with not telling the truth.

Q. Are you testifying that you had no issue with Carolyn Stuckey?

A. Carolyn Stuckey? I have no issue with Carolyn Stuckey.

Joiner Dep. 53:8–54:8 (Def. Appx. 169–70).

On October 5, 2010, Erin Banach, a Quality Assurance Supervisor, wrote to Groth to complain about the way in which Plaintiff was treating Banach's employees. Def. Appx. 374. Banach's email forwarded an email she had received from Kimberly Bremer, a senior quality assurance and defect tracking employee, also dated October 5, 2010, in which Banach wrote:

> I need to vent. I am furious with [Plaintiff]. She was so disrespectful and rude to me. She is always reprimanding people for talking too loud. She was coming up behind my desk, I turned and looked at her and said [Plaintiff] I need to ask you a question. She kept walking towards Sandy's desk. I said [Plaintiff] I'm talking to you and she said I can hear you. I told her I was not going to yell my question across the department. Everyone was in awe!

Def. Appx. 374. Plaintiff addressed this issue in her EEOC filing, stating:

> I was walking when Kim Bremer (a white) called out my name and I said "I will be right back." Meanwhile, I went to Sandy's desk to pick some folders for Caroline's desk. And, then I went to Kim's desk—I was written up for not stopping immediately because her feeling got hurt when she had called out my name. And, Kim B. didn't accept me saying to her "I will be right back."

Def. Appx. 18.

Based on Banach's complaint set out above, Groth held a "due process" meeting with Plaintiff on October 5, 2010. As documented in a Corrective Action Form, Def. Appx. 369–70, Groth and Plaintiff met with Kurz in April, Langmaid in May, and Traver in June, to discuss Plaintiff's conduct at MVP. Groth's conclusion, which Plaintiff refused to sign, or submit comments on, was as follows:

6

It is expected that Ms. Joiner exhibit professional behavior by using tact, consideration and respect in all on the job relationships with her co-workers, staff and customers. She must refrain from using verbal language that can be construed as mocking or insulting to individuals. Ms. Joiner is expected to listen to individuals and make herself approachable so that people are willing to speak with her. Ms. Joiner's role as Supervisor requires her to effectively supervise people in teams, create strong morale, team spirit, and a shared sense of responsibility in a cohesive environment. She also needs to foster open communication, encourage staff input, display careful judgment, and is a calming force in times of adversity. Recurrence of any of these concerns will result in further corrective action up to and including termination.

Ms. Joiner and I will have weekly status meetings to discuss any employee issues she may be having on the team. Ms. Joiner should also copy her manager in on emails that she sends to her staff regarding performance issues or coaching reminders.

*Effective immediately, you must meet and maintain an acceptable level of performance. Failure to achieve and maintain an acceptable level of performance in the above criteria or in any other area as determined by MVP in its sole discretion, may result in further corrective action up to and including termination.*

Def. Appx. 370. Interestingly, Plaintiff comments in her Counter-Statement that the representation in the document described above is one-sided. As Groth noted on the form, however, Plaintiff refused to submit comments to Groth at the time of the meeting, or within five days after it. Def. Appx. 370. Plaintiff, though, did admit at her deposition that the warning outlined above was read to her and that she was warned not to treat her co-workers disrespectfully. Joiner Dep. 56:24–57:14 (Def. Appx. 172–73). In her defense, Plaintiff related that the three employees about whom she was asked at her deposition who accused her of being disrespectful were wrong. *Id.* 58:6–8. Plaintiff was unable to recall any other coworkers who were correct when they accused her of acting disrespectfully. *Id.* 58:9–15 (Def. Appx. 174).

7

Defendant points to a document entitled "Status Agenda for (Date) 1/26/12," Def. Appx. 406. The document appears to be a meeting agenda and has handwritten notations as well as check marks on some of the items. Plaintiff contends that this document,

> has been FALISIFIED [sic] to appear as if we held a meeting on January 26, 2012, due to the check marks on each items [sic]. This is FORGERY [sic] because Debbie Goth had walked out of this meeting when I had asked at the beginning of this meeting why she was reassigning my team members to adjusting claims.

Def. Appx. 286. Evidently, out of twenty-four weekly status meetings with Groth, the January 26, 2012, meeting is the only one Plaintiff contends did not occur. *C.f.* Def.'s Statement ¶ 27, ECF No. 49, *with* Pl.'s Counter-Statement ¶ 27, ECF No. 59. The remaining twenty-three meetings were held by Groth in an attempt to improve Plaintiff's performance. Joiner Dep. 70:17–20 (Def. Appx. 186). Further, when Plaintiff asked for additional training, Groth saw that it was provided. Def. Appx. at 187–89, 407–16. Despite agreeing at her deposition that she received necessary training, in her Counter-Statement, Plaintiff contends that:

> I disputed the statement contained in ¶ 29 of the Defendant's Local Rule 56 of Statement of Material Fact to the extent the training directly refers only to "a list" of edit codes; excluded on that list were the new jobs that was assigned to my desk which had altered my term and condition of my employment. I had a monthly "global" spreadsheet assigned to my desk on July 15, 2011 with unlimited claims and received the written procedure on January 3, 2012—and were unlawfully terminated on February 3, 2012.

Pl.'s Counter-Statement ¶ 29. The statement above is indecipherable and does relate to the corresponding statement, supported by evidentiary proof, made by Defendant.

On November 11, 2010, Goth sent Plaintiff an email with the subject line, "FW: Daily assignments." It concerned claims that had been pending for several days and on which Plaintiff's staff was supposed to be working. Joiner Dep. 84 (Def. Appx. 200). Plaintiff was asked the following questions and made the following responses with respect to Groth's email:

> Q. And in that e-mail [responding to Groth's], you wrote, "Debbie, first, Jason knows we have to get to work up to UM first. One of our daily team priorities." And "one of our daily team priorities" is underlined, correct?

> A. Yes.

> Q. You also CCed Ms. Groth's supervisor, Ms. Traver, on this e-mail; correct?

> A. Correct.

> Q. And you were publically reminding your supervisor about the daily team priorities; is that correct?

> A. Trying to, correct. Yes.

> Q. In front of her own supervisor?

> A. Correct.

> Q. Do you feel that's appropriate behavior?

> A. Yes.

> Q. Okay. Do you see above that, Ms. Traver's response, sent Friday, November 12, 2010, at 13 10:38 a.m., where she states, "I am seriously concerned with your response to Debbie below. I find it completely unacceptable and unprofessional to speak this way to your manager." Do you see where it says that?

> A. Yes.

> Q. Do you agree with that statement?

> A. No.

> Q. So you don't think your response was unacceptable and unprofession-
> al?
>
> A. No. Because everyone knows our daily priorities will be to get the work
> up to UM first.…
>
> Q. You were aware Ms. Traver believed your response and your behavior
> was unacceptable and unprofessional, correct?
>
> A. According to this e-mail, yes.

Joiner Dep. 84:19–86:9 (Def. Appx. 200–02). In her Counter-Statement, Plaintiff states

that "the statement neglects to state the answer given was due to the labor loaning of

my staff." Pl.'s Counter-Statement ¶ 30. In the deposition transcript pages to which

Plaintiff cites in support of her Counter-Statement, she testified she copied Kellie Traver

on the email to Groth,

> Because I've always been told, "You're not getting the work up to UM." So
> Kellie was copied in to let her know I had it set up to go there first. But
> Debbie Groth comes in with her directive above me and changed things.
> She always changed the goal for my team.

Joiner Dep. 99:15–20 (Def. Appx. 215).

Plaintiff underwent another review on December 8, 2010, in which were noted

several areas in which she needed development. The performance appraisal was sepa-

rated into three parts: organizational behaviors; quality & quantity of work; and key job

responsibilities. Def. Appx. 417–18. Each of those three parts contained several lines

relating to specific requirements followed by a rating of from one to four, one being

"needs development," and four being "exceeds requirements." *Id.* Plaintiff's overall

score was 1.60. As an example of one of the low scores, Plaintiff received a score of "1"

in

> Respect/Teamwork: is open and receptive to feedback and coaching. Ac-
> tively looks for opportunities to collaborate with teammates. Actively en-
> courages and invites the ideas and opinions of others. Acknowledges and
> respects the role of our physicians. Treats others with dignity and seeks
> diversity. Focuses on the moment with and offers support to others.

Def. Appx. 417. In the action plan section, her reviewer, Goth, wrote the following:

> [Plaintiff] needs to respond to all emails timely. If she can not resolve the
> issue in 48 hours she still needs to reply to the email indicating when she
> will be able to provide and [sic] answer. [Plaintiff] needs to prioritize her
> desk daily so that she can get all of her required work completed while re-
> solving issues, working hand in hand with her team members and other
> claims teams. She needs to make sure to communicate to staff what the
> overtime assignments are for the week. [Plaintiff] needs to be aware of
> how she presents herself to her staff members and other employees to
> MVP when communicating with them to ensure they do not perceive her
> as being offensive or not wanting to bother with them. [Plaintiff] needs to
> bring her manager's attention when she is unsure of a process or needs
> additional training in something.

Def. Appx. 418. One of the items Groth highlighted in the form concerned her require-

ment that Plaintiff respond to all emails within forty-eight hours, even if Plaintiff could not

resolve the problem. Plaintiff testified at her deposition that she received between "2 to

300 e-mails a day" and that "it was impossible to answer all e-mails" "the system wasn't

equipped to handle it itself" and she "kept being locked up in e-mail jail." Joiner Dep.

77:16–20 (Def. Appx. 193).Plaintiff did not sign the form, but merely indicated in a

handwritten note that she would be "following up w/ Annelli for further discussions" and

signed the note on December 8, 2010. *Id.* In her Counter-Statement, Plaintiff states that

this review of December 8, 2010, was the first she had had since assuming the manag-

er position on March 21, 2010, and that her "stats prove it [she has] been eliminating

that huge volume of aging claims (24,483+-) that Linda Gallagher had left behind." Pl.'s

Counter-Statement  25. In support of her Counter-Statement, Plaintiff cites to "Pl.'s Aff.,

Tab 47; statics data shows we're moving out of the red." The Court has reviewed Plain-

tiff's Affidavit in Support of Opposition to Summary Judgment, Jan. 23, 2014, ECF No. 60, consisting of a total of 224 pages, and does not find a "Tab 47." The page hand marked as 47 concerns an email from Groth to Plaintiff about reassignment of one employee, not statistics showing that the backlog of claims was diminishing.

On January 26, 2011, Plaintiff attended another "due process" meeting with Groth, Prince and Aneli Rivera-Platt, director of employee relations and development. Def. Appx. 419–20. The Corrective Action Form, dated January 31, 2011, noted several deficiencies on Plaintiff's part, particularly focusing on the requirement for a 48-hour turnaround on emails. The form also outlined the October 5, 2010, meeting and others concerning Plaintiff's unprofessional behavior. One notation pointed out that Plaintiff received an email dated January 20 at 1:55 p.m., read it at 2:17 p.m., and never responded to it. The email asked claims supervisors if they needed to attend a meeting concerning scanning issues and notes that as a result of her unresponsiveness, "she was not invited to the meeting and her team's concerns were not represented." Def. Appx. 420. The form also notes a similar nonresponsiveness to an email on an personnel matter, which resulted in a delayed due process meeting for another employee. *Id.* The "Action/Consequences" portion of the form reads similarly to the action required of her as a result of the December 2010 due process meeting. The section for employee comments has a handwritten notation, "I have submitted [illegible] response to HR Director." *Id.* Her Counter-Statement also refers back to paragraph six, subparagraphs (d) through (n). In subparagraph (d), Plaintiff states that she was terminated with thirteen claims thirty days or more old, whereas Linda Gallagher, the supervisor before her, was promoted with 26,483+- claims in backlog. Pl.'s Counter-Statement at 6. Plaintiff makes

reference to using "selected Julian Dates," and claims that Defendant lied about her backlog of claims upon her termination. However, she does not explain what she means by using "selected Julian Dates." *Id.* at 7. On page 8 of her Counter-Statement, Plaintiff questions why her supervisor, Groth, did not do a better job of handling Plaintiff's claims while Plaintiff was on vacation. The remaining subparagraphs of paragraph six contain details about claims processing that Plaintiff evidently submits to show that she worked diligently, but that others always thwarted her efforts, whereas white employees were held to different standards. In one sub-subparagraph on page 11, she states, "[t]he white Supervisors had items in their service matrix basket up to 117+- days; etc. no written warnings/due process" and cites to Exhibits 12–17. Unfortunately, the document Plaintiff submitted contains 157 pages in total, and none appear to be marked with an exhibit number.

The Court will refrain from a further detailed assessment of the competing statements of fact in this decision. Nevertheless, it has read and reviewed all 44 pages of Defendant's statement of facts and the corresponding portions of Plaintiff's Counter-Statement.

## STANDARDS OF LAW

### *Summary Judgment Standard*

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a

*prima facie* showing that the standard for obtaining summary judgment has been satis-

fied." 11 MOORE'S FEDERAL PRACTICE § 56.11[1][a] (Matthew Bender 3d ed.). "In moving

for summary judgment against a party who will bear the ultimate burden of proof at trial,

the movant may satisfy this burden by pointing to an absence of evidence to support an

essential element of the nonmoving party's claim." *Gummo v. Village of Depew,* 75 F.3d

98, 107 (2d Cir. 1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)),

*cert. denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate specific facts

showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c); *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 250 (1986). To do this, the non-moving party must present

evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249.

"[F]actual issues created solely by an affidavit crafted to oppose a summary judgment

motion are not 'genuine' issues for trial." *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614,

619 (2d Cir. 1996). Summary judgment is appropriate only where, "after drawing all rea-

sonable inferences in favor of the party against whom summary judgment is sought, no

reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988

F.2d 303, 308 (2d Cir. 1993). The parties may only carry their respective burdens by

producing evidentiary proof in admissible form. Fed. R. Civ. P. 56(c)(1)(B). The underly-

ing facts contained in affidavits, attached exhibits, and depositions, must be viewed in

the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654,

655 (1962). Moreover, since Plaintiff is proceeding *pro se*, the Court is required to con-

strue his submissions liberally, "to raise the strongest arguments that they suggest."

*Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). Since Plaintiff is proceeding *pro se,*

the Court is required to construe his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994).

Of course, it is well-settled that courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citations and internal quotations omitted). However, the general rule holds and a plaintiff may not defeat a motion for summary judgment merely by relying upon "purely conclusory allegations of discrimination, absent any concrete particulars which, if believed, would show discrimination." *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citations and internal quotations omitted); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

### *Title VII & ADEA Disparate Treatment & Retaliation Claims*

In *Brennan v. Metropolitan Opera Ass'n, Inc*., 192 F.3d 210 (2d Cir. 1999) the Second Circuit concisely set out the standards of law governing disparate claims under Title VII and the ADEA, stating:

> The same standards govern disparate treatment claims arising under either Title VII or the ADEA. *See Austin v. Ford Models, Inc.,* 149 F.3d 148, 152 (2d Cir.1998). First, the plaintiff must prove a prima facie case of discrimination as originally outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), by showing: (1) that she was a member of a protected class, (2) that she was qualified for the position, (3) that she experienced an adverse employment action, (4) under circumstances giving rise to an inference of discrimination. *Viola v. Medical Systems of North America,* 42 F.3d 712, 716 (2d Cir.1994). Once the plaintiff has met this *de minimis* burden, *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994), the burden of production shifts to the employer to proffer a legitimate, nondiscriminatory reason for

the action. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). If the employer meets its burden of production, the inference of discrimination raised by the prima facie case then drops out and the plaintiff must prove by a preponderance of the evidence that the employer's proffered reason is merely a pretext for discrimination. *Id.* at 507-08, 113 S. Ct. 2742.

*Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d at 316–17.

With regard to whether an employee is qualified for a position under the ADEA, the law is clear: "an individual is otherwise qualified for a job if she is able to perform the essential functions of that job, either with or without a reasonable accommodation." *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 135 (2d Cir. 1995).

With respect to Plaintiff's claim of a hostile working environment, the standard was set out by the Supreme Court in *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993):

> When the workplace is permeated with "discriminatory intimidation, ridicule, and insult," 477 U.S., at 65, 106 S. Ct., at 2405, that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," *id.,* at 67, 106 S. Ct., at 2405 (internal brackets and quotation marks omitted), Title VII is violated.

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993). Whether the environment may be considered sufficiently hostile or abusive to support a hostile work environment claim is to be measured by the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether the conduct unreasonably interferes with an employee's work performance." The Court may also take into account any psychological harm suffered by the employee, but "no single factor is required." *Harris,* 510 U.S. at 23.

Finally, with regard to Plaintiff's retaliation claims, in order to present a *prima fa-cie* case, a plaintiff must provide evidence sufficient to permit a rational trier of fact to find that she engaged in protected activity, or opposed conduct that is illegal under Title VII or the ADEA, that the employer was aware of her protected activity or opposition, that the employer took adverse action against the plaintiff and that a causal connection exists between the protected activity and the adverse action, in other words, that a retal-iatory motive played a part in the adverse employment action. *See Kessler v. Westches-ter County Dept. of Social Services*, 461 F.3d 199, 205–06 (2d Cir. 2006).

## ANALYSIS

In this case, Plaintiff's opposition to summary judgment appears predicated on the belief that she may avoid judgment by offering conjectures, unsupported by any fact of evidentiary value in a multitude of irrelevant suppositions and innuendo contained in prolix affidavits and hundreds of pages of exhibits. None of these raise an issue of fact sufficient to defeat the motion for summary judgment. Although she disputes Defend-ant's contentions of unprofessional conduct or that she did not complete work or re-spond to email, she points to no evidence that Defendants' actions were undertaken with a discriminatory intent, or in retaliation for complaining of discrimination.

Plaintiff has failed to raise a prima facie case pursuant to ADEA, Title VII, or re-taliation. Plaintiff's specific claims from the Complaint include matters that have no sup-port in her pleading itself, let alone in the papers she submitted in opposition to the in-stant motion: failure to provide her with reasonable accommodations to the application process; and failure to provide her with reasonable accommodations so she could per-form the essential functions of her job. Though she claims discrimination based on her

17

race, age and national origin, Compl. ¶ 14, she presents no evidence or allegations of national origin discrimination.[3]

Each of Plaintiff's claims is subject to the *McDonnell Douglas*[4] burden shifting analysis. Plaintiff has not raised an inference of discrimination or retaliation in her submissions and the Court determines that the evidentiary proof in admissible form shows that Defendant terminated Plaintiff after repeated instances of insubordinate and unprofessional behavior, despite counseling, and because of her inability to complete her work on time and in the manner required by her employer. Plaintiff's comparators with respect to disparate treatment have not been shown by her to be "similarly situated in all material respects" with herself. *See Mandell v. County of Suffolk*, 316 F.2d 368, 379 (2d Cir. 2003); *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (quoting *Cherry v. American Tel. & Tel. Co.,* 47 F.3d 225, 229 (7th Cir. 1995) ("there should be an 'objectively identifiable basis for comparability'")). Here, Plaintiff has not shown that the comparators, as discussed above, had an objectively identifiable basis for comparability. None of the comparators was shown to have acted in an unprofessional manner, nor were any shown to have failed to respond to email within 48 hours. Moreover, the evidence before the Court on this motion shows that Groth both hired and promoted Plaintiff, and was the one who documented her failure to comply with counseling, issuing her

---

[3] In *Corbitt v. Queens Health Network*, 535 Fed. Appx. 42, 43 (2d Cir. 2013), the Second Circuit noted that were the defendant has offered, "legitimate, non-discriminatory, and non-retaliatory reasons for taking adverse actions against" the employee, the Court need "not decide whether [the plaintiff] established a prima facie case of discrimination or retaliation."

[4] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (retaliation); *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010) (race discrimination).

not one, but two "final" warnings before terminating her.[5] Evidence that the same indi-

vidual who hired Plaintiff was the one who promoted and eventually terminated her cuts

against Plaintiff's claims of discrimination or retaliation. Plaintiff presented no evidence

that her position was filled with someone of a different race or who was younger. Fur-

ther, Defendant did not terminate Plaintiff until February 2012, four months after Plaintiff

filed the present lawsuit, and eleven months after she filed an EEOC charge against De-

fendant. It appears to the Court from reviewing Plaintiff's papers that she relies on tem-

poral proximity to prove retaliation. However,

> [w]hen a plaintiff is relying solely on temporal proximity, the protected ac-
> tivity and an adverse employment action must occur "very close" to each
> other. *Clark County School Dist. v. Breeden,* 532 U.S. 268, 273, 121 S. Ct.
> 1508, 149 L.Ed.2d 509 (2001). While the Second Circuit has not set a
> bright-line rule for how much time can pass before a temporal relationship
> becomes too attenuated, courts in this Circuit have consistently held that
> the passage of two to three months between the protected activity and the
> adverse employment action precludes an inference of retaliation. *See Gal-
> imore,* 641 F. Supp. 2d at 288.

*Petrisch v. JP Morgan Chase,* 789 F. Supp. 2d 437, 450 (S.D.N.Y. 2011). In this case,

Plaintiff makes a conclusory statement, Def. Appx. 455, that an email dated March 31,

2011, the content of which she fails to detail, was in retaliation. Her claim is without any

factual background, other than to state that, "Plaintiff 'exempt' benefits being taken

away after the Plaintiff filing with EEOC. Discriminatory, Retaliatory." Without more, it is

impossible to determine who sent the email, and what, if any, action was taken which

Plaintiff concluded was in retaliation for her having filed an EEOC complaint. Further,

---

[5] At oral argument, Plaintiff disputed that Groth was the one who hired her. However, in the Com-
plaint Addendum, page 12 of 19 pages, under the date September 19, 2010, Plaintiff wrote: "Debbie
Groth stated she needs a level headed Supervisor for the GOV'T Programs. I'm not that old! And I have
asked her many times as to why she had hired me." In her deposition testimony, Plaintiff asserted that
Linda Gallagher hired her, but did not know if Debbie Groth was involved in the decision to hire her. Def.
Appx. 143. In any event, Plaintiff does not dispute that Groth promoted her. Def. Appx. 150.

Defendant provided a copy of a memorandum sent to Plaintiff shortly after she filed her EEOC complaint explaining Defendant's policy against retaliation. Def. Appx. 439.

Plaintiff has made the Court's review more difficult by the voluminous, vague and repetitive papers submitted in response to Defendant's motion. Plaintiff's response to Defendant's 44 page statement of facts is 157 pages in length. Plaintiff submitted an additional 94 pages in an affidavit opposing summary judgment, a memorandum of law 27 pages in length, and an additional 224 pages in another affidavit opposing summary judgment. ECF Nos. 58, 59 & 60. The volume of paper is "a prolixity seemingly designed to obscure rather than to illumine the events giving rise to this lawsuit." *Pross v. Katz*, 784 F.2d 455, 456 (2d Cir. N.Y. 1986). Her references to "tabs" failed to produce any evidentiary support for her conclusory statements, and even during oral argument, the Court was unable to ascertain to what "tabs" referred in her papers. In short, Plaintiff has failed in her burden to raise a material issue of material fact precluding summary judgment, and has failed in her burden under *McDonnell Douglas* to show that Defendant's proffered non-discriminatory reasons for disciplinary proceedings and termination were false and the real reason was discrimination or retaliation.

## CONCLUSION

Defendant's motion for summary judgment, ECF No. 48, is granted and the case is dismissed. The Clerk is directed to enter judgment for Defendant.

IT IS SO ORDERED.

Dated:  March 19, 2014
        Rochester, New York

ENTER.      /s/ Charles J. Siragusa
            CHARLES J. SIRAGUSA
            United States District Judge